## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHARLES STEVENS JR., | : | CIVIL ACTION NO. |
| | : | 3:03 CV 1948 (JBA) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COACH U.S.A., PETER PAN | : | |
| BUS LINES, INC., and KILT OF | : | |
| CT, INC., | : | |
| | : | |
| Defendants. | : | FEBRUARY 7, 2005 |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I.      INTRODUCTION**

Charles Stevens was a loyal and reliable driver for the Arrow Line, a subsidiary of defendant Coach USA.  In May 2002, he went on FMLA leave for about a month.  When he tried to return, Arrow retaliated against him for taking leave.  Arrow would like the Court to believe that Stevens has kept himself from returning to work.  It says that when he tried to come back, it needed clarification about three medical issues – a heart condition, hepatitis, and his mental health.  It claims that while Stevens resolved the first two issues he still hasn't given it proper documentation on the third.  Therefore, Arrow says, it simply can't qualify him to drive under its and the DOT's regulations.  But the facts of this case aren't as simple as Arrow tries to make them out to be.  Actually, Arrow raised barrier after barrier for nearly a year making it impossible for Stevens to drive again.

From the day he tried to come back in June 2002, for about three months, Arrow never just told him, up front, what medical issues it needed clarification on, the tests or

exams they wanted, and where he could get them done.  Instead, after demanding a series of increasingly specific notes from his primary care physician (who said he was medically fit to return to work), it promised him he could drive again if he passed a cardiac stress test.  Then, when he passed the test, it wouldn't let him come back.  Instead, in October 2002, it came up with a new obstacle:  making him see a doctor or psychiatrist to clarify an answer about "treatment for a nervous disorder" he gave in June on a return to duty questionnaire.  The questionnaire said he didn't need to answer the question.  Furthermore, as Arrow knew, Stevens answered it incorrectly, because he hadn't been treated for such a disorder; he and his wife had had marriage counseling. And although Arrow had never expressed concern about this answer before, it now used it as another reason to keep him out.  After raising this new barrier, Arrow told Stevens incorrectly on at least six occasions from fall 2002 through spring 2003 that he needed to see specifically a *doctor* or *psychiatrist* for clearance.  It never told Stevens that he could have gotten clearance from an MD, DO, chiropractor, or nurse.  It never told Stevens that he could have gotten clearance from the physician's assistants at the clinic in Norwich (15 minutes from his home in North Stonington) where he'd gone before for Arrow physical exams.  When Stevens wrote to Arrow to ask it if it had the name of a "psychiatrist" who could evaluate him in one meeting, Arrow didn't bother to answer his letter.  It not only ignored his request for information, it again didn't tell him that the clearance didn't have to come from a psychiatrist.  It again didn't tell him that the physician's assistants who had three times in the past found him mentally fit to drive could have cleared him.

Arrow is trying to blame Stevens for failing to follow regulations it didn't tell him about; ignored his request about; gave him inaccurate information about; and withheld information about.   But it cannot hide behind DOT regulations or its Medical Management Program.  These rules do not excuse its actions.  Stevens has demonstrated that Arrow's numerous barriers to his return to work after FMLA leave give rise to an inference of retaliatory intent.   Arrow cannot articulate non-retaliatory reasons for all actions.   Should Arrow attempt to, Stevens is entitled to a trial to show its supposedly legitimate reasons are pretexts.  Arrow's motion for summary judgment should therefore be denied.

## II.    FACTS AND BACKGROUND

Stevens is 54-years-old.[1]   He finished the eighth grade but never started high school.[2]   After military service he worked at Electric Boat in the early 1970s and then framed houses briefly.[3]   In about 1987 he began his career as a commercial bus driver at South East Transit, where he worked for 13 years.[4]   Arrow, a subsidiary of Coach USA, hired him in June 2000 to work in its Waterford, Connecticut branch.[5]   At Arrow Stevens made about $11.25 per hour.[6]   While there, Stevens was a member of the Amalgamated Transit Union Local 1348.[7]

---

[1]  January 23, 2002 Medical Examination Report For Commercial Driver Fitness Determination ("January 2002 Medical Report"), Exhibit 1, at 1.  (All exhibits cited in this Memorandum refer to those attached to Stevens's Local Rule 56(a)2 Statement).
[2]  May 11, 2004 Deposition of Charles Stevens ("Stevens Depo."), Exhibit 2, at 8:23-24.
[3]  Stevens Depo., Exhibit 2, at 14:19-22.
[4]  Id. at 12 – 14; 15:2-4.
[5]  Defendants' December 31, 2004 Local Rule 56(a)1 Statement at ¶¶4-6.  Stevens Depo., Exhibit 2, at 12:10-15.
[6]  Stevens Depo., Exhibit 2, at 118:8.
[7]  November 17, 2004 Deposition of Garfield Rucker ("Rucker Depo."), Exhibit 3, at 10:12 – 11:4; 13:16-25.  Stevens Depo., Exhibit 2, at 13:6-8.

Arrow bus drivers must be certified according to DOT medical regulations before they're allowed to drive.[8]  Coach, Arrow's parent, has a written Medical Management Program to ensure that drivers comply with the DOT regulations.[9]  Jeffrey S. Liva and William J. Nassetta are New Jersey physicians employed by Coach to oversee the medical examination of Arrow drivers under the Program.[10]  Liva and Nassetta, LLC, contract with physicians in Connecticut to examine drivers and report the results to them.[11]  The Medical Examiner's Certificate, which is an addendum to the written Program, says that MDs, DOs, chiropractors, advanced practice nurses, and physician's assistants can find a driver qualified to drive under DOT regulations.[12]  On at least three occasions, Stevens was certified to drive under DOT regulations by physician's assistants Turturo and Kaiser at a Norwich, Connecticut clinic.[13]  Arrow safety director Phil Andrews served as a liaison among Arrow, Liva and Nassetta, the contracting clinics, and the drivers.[14]

On about May 10, 2002 Stevens went on FMLA leave for hepatitis related exhaustion.[15]  On June 6, 2002 he came back to Arrow, ready to drive again.[16]  He gave Arrow a June 6, 2002 note from his doctor of 22 years, Woong B. Lee, that said "Charles Stevens has been under my medical care.  The patient has been out of work since 5-10-02

---

[8]  October 19, 2004 Deposition of Jeffrey S. Liva ("Liva Depo."), Exhibit 4, at 9:18-21.
[9]  November 8, 2004 Deposition of Phil Andrews ("Andrews Depo."), Exhibit 5, at 10:5-13.
[10]  Liva Depo., Exhibit 4, at 9.
[11]  *Id.* at 8:21 – 9:4.
[12]  Coach USA Medical Examiner's Certificate, Exhibit 6.
[13]  Medical Examiner's Certificate, exp. date December 27, 2000.  Medical Examiner's Certificate, exp. date December 27, 2001, Exhibit 7.  January 2002 Medical Report, Exhibit 1.
[14]  Andrews Depo., Exhibit 5, at 11:8-16.
[15]  Stevens Depo., Exhibit 2, at 19:4 – 20:23.
[16]  *Id.* at 21:13-16; 27:9-16.

and may return to work on 6-8-02."[17]  Arrow gave Stevens a Coach USA Return to Duty Questionnaire with 15 questions and asked him to fill it out.[18]  The Questionnaire said above the questions that "Questions/Answers should only pertain to employee's most recent illness/injury."[19]  Indeed, Liva and Nassetta designed the Questionnaire to get from returning Coach drivers a "description of the illness or injury which precipitated the time off from work [. . . .]"[20]

Because Stevens had had time off for hepatitis related exhaustion, he needed, according to Liva and Nassetta, to answer only questions that related to that specific illness.[21]  None of the questions referred to hepatitis.[22]  So Stevens really only needed to answer question number 15, "Do you have or are you being treated for **any** condition that would preclude safe operation of a CMV or cause sudden incapacitation?"[23]  And he answered that question accurately by circling "No."[24]  But Stevens had never filled out one of these Coach Questionnaires before.[25]  So he made a mistake and answered two additional questions (8 and 13) he didn't need to – ones that didn't have anything to do with his "most recent illness," hepatitis.[26]

Arrow knew Stevens and his wife had met eight to 12 times that spring with a marriage counselor, James Lindsay.[27]  Stevens didn't want it to look like he was trying to

---

[17] June 6, 2002 note from Woong B. Lee, MD ("6/6/02 Lee note"), Exhibit 8.  Stevens Depo., Exhibit 2, at 27:7-16.
[18] Questionnaire, Exhibit 9.  Stevens Depo., Exhibit 2, at 27:23 – 28:2.
[19] Questionnaire, Exhibit 9; Liva Depo., Exhibit 4, at 59:4-7.
[20] Liva Depo., Exhibit 4, at 16:1-15.
[21] *Id.* at 16:1-15.
[22] Questionnaire, Exhibit 9.
[23] *Id.* (emphasis in original).
[24] *Id.*
[25] Stevens Depo., Exhibit 2, at 29:25 – 30:2.
[26] Questionnaire, Exhibit 9..  Liva Depo., Exhibit 4, at 16:1-15.
[27] Stevens Depo., Exhibit 2, at 33:18-19; 35:1 – 36:3; 42:13-16.  Liva Depo., Exhibit 4, at 86:23 – 87:3.

hide these meetings.[28]  He was, in his own words, "covering his ass."[29]  So he circled "Yes" for question 8, "Do you have or are you being treated for any mental, nervous disease or psychiatric disorder?"[30]  Stevens told Andrews that the marriage counseling was the only reason he was answering question 8.[31]  Stevens had never been treated for any mental, nervous disease or psychiatric disorder.[32]  And according to Arrow, attending marriage counseling does not automatically make someone unfit to drive a bus.[33]

Stevens also circled "Yes" in response to question number 13, "Are you taking **any** medication? (Prescription or over-the-counter)" to refer to his use of Procardia, a heart medication.[34]  Arrow had long known about Stevens's Procardia use because he revealed it during his 1999 pre-employment physical and as recently as his January 23, 2002 physical.[35]  Like question number 8, Stevens didn't need to answer this question because it didn't concern his hepatitis.[36]

Stevens made a small mistake.  But Arrow is known for getting "hung-up" on employees' mistakes and having "thing[s] against" those who make them.[37]  It will keep them out of work no matter what they do to try to return.[38]  So for the next several months Arrow made it impossible for Stevens to drive again.[39]

---

[28] Stevens Depo., Exhibit 2, at 32:3-5.
[29] Id. at 32:3-5.
[30] Id. at 33:18-19; 32:5.  Questionnaire, Exhibit 9.
[31] Stevens Depo., Exhibit 2, at 30:17-21.
[32] Id. at 141:20-142:1.
[33] Andrews Depo., Exhibit 5, at 49:3-5.
[34] Questionnaire, Exhibit 9.
[35] Stevens Depo., Exhibit 2, at 50:9-14.  January 2002 Medical Report, Exhibit 1.
[36] Questionnaire, Exhibit 9.  Liva Depo., Exhibit 4, at 59:4-7.
[37] Rucker Depo., Exhibit 3, at 42:9-15.
[38] Id. at 42:9-15.  Stevens Depo., Exhibit 2, at 68:5-17.
[39] Stevens Depo., Exhibit 2, at 95:11-13; 99:21-24; 133 – 135.  Rucker Depo., Exhibit 3, at 32:10-22; 41:10-21; 42:9-23.

On June 6, 2002, after Stevens gave Andrews Lee's note, Stevens placed "bids" on some upcoming driving jobs.[40]  Minutes later, Arrow safety department employee Al Pambino approached Stevens and told him Arrow would not accept his note.[41]  Someone at Coach's Houston headquarters wanted a more specific note from Lee.[42]  The next day, Stevens gave Arrow a second note from Lee, dated June 7, 2002, which said, "Mr. Charles Stevens has been under my care for his Coronary Insufficiency which requires Procardia, and also, intermittent flare ups of Hepatitis.  Mr. Stevens may return to work on June 8, 2002.  Please do not hesitate to contact me."[43]  Despite Lee's invitation to Arrow to contact him to discuss Stevens's health, Arrow never did.[44]

For the next several days Arrow did not tell Stevens if Lee's second note was adequate.[45]  Eventually, Stevens called Andrews, who told him that Coach needed yet another note.[46]  On July 17, 2002, Stevens gave Arrow a third note from Lee which said, "Mr. Charles Stevens has been under my care for his Hepatitis for which he has been followed very closely.  There are *no medical contraindications for his work.*"[47]

Around this time, Stevens spoke with Liva on the telephone to make sure he knew that Stevens had been taking Procardia for years.[48]  Liva was rude and dismissive to Stevens.[49]  He didn't tell Stevens what his concerns were about Stevens's health or exactly what he needed to do to return to work.[50]  Around this time, Stevens also asked

---

[40] Stevens Depo., Exhibit 2, at 43:13-18.
[41] *Id.* at 43:18-23.
[42] *Id.* at 45:22-24.
[43] *Id.* at 47:16-19.  June 7, 2002 note from Woong B. Lee, MD ("6/7/02 Lee note"), Exhibit 10.
[44] Liva and Nassetta office notes, Exhibit 11, at 1.
[45] Stevens Depo., Exhibit 2, at 48:6-18.
[46] *Id.* at 48:6-18.
[47] July 17, 2002 note from Woong B. Lee, MD ("7/17/02 Lee note"), Exhibit 12.  (emphasis added).
[48] Stevens Depo., Exhibit 2, at 50:9 – 52:14.
[49] *Id.* at 50:9 – 52:24.
[50] *Id.* at 52:5-14.

Arrow if there was any type of work – answering phones or cleaning busses – he could do until it would let him drive again.[51]  Arrow said it had nothing for him to do.[52]

In June or July 2002 Stevens called the Union's Business Agent Garfield Rucker.[53]  Stevens never filed a written grievance because Rucker and Union President Russ Daniels began trying to help him immediately and spent "a lot of time" on his case.[54]  As the Union Agreement states, the only point of filing a written grievance is to bring a matter to the Business Agent's attention.[55]

For the next three months, Arrow *never once* told Stevens it wasn't letting him return to work because of his answer to question 8 (the "nervous disease" question) or even mentioned any aspect of his mental health.[56]  At most, it discussed with him his cardiac health.[57]

On August 10, 2002, Stevens, Rucker, and Daniels met with Arrow's General Manager Stephen Archambault.[58]  Rucker arranged the meeting so that Stevens could find out exactly what he had to do to begin driving again at Arrow.[59]  Archambault told Stevens that *the one thing he needed to do* to return to work was take and pass a cardiac stress test.[60]  Indeed, before recently changing its interrogatory answer, *Arrow admitted that Archambault told Stevens during that meeting that he'd be able to return to work if*

---

[51] *Id.* at 126:18 – 127:17.
[52] *Id.* at 127:19-20.
[53] *Id.* at 14:20-21; 53:1-8; 56:7-13; 58:7-13.
[54] *Id.* at 58:7-13.  Rucker Depo., <u>Exhibit 3</u>, at 21:21-25; 23:1-24; 32:4-5.
[55] Agreement Between The Arrow Line Inc. and The Amalgamated Transit Union Local 1348, Grievances and Arbitration (the "Agreement"), Article G2, <u>Exhibit 13</u>, at Section 1(a)-(b).
[56] Stevens Depo., <u>Exhibit 2</u>, at 143:9-14.
[57] *Id.* at 143:9-14.  Liva and Nassetta office notes, <u>Exhibit 11</u>, at 1.  Andrews Depo., <u>Exhibit 5</u>, at 20:22 – 21:17.
[58] Stevens Depo., <u>Exhibit 2</u>, at 70:6 – 71:2.
[59] *Id.* at 60:11-16.
[60] *Id.* at 72:3-7; 75:7-10.  Rucker Depo., <u>Exhibit 3</u>, at 36:21 – 37:4.

*he passed a stress test.*[61]  Arrow actually made Stevens's stress test appointment.[62]  At some point in September 2002 Stevens took the test at a hospital in Rhode Island.[63]  Liva has testified that Stevens passed the test.[64]  Although Coach first claimed it "[did] not recall being informed of the result[s]" of the test, it later revealed that it did receive them.[65]

Even though it told him as "clear as a bell" that the stress test was "the last thing" he had to do, Arrow still wouldn't let Stevens come back.[66]  Instead, *for the first time in three months*, Arrow expressed concern with Stevens's answer to the "nervous disease" question, number 8 on the Questionnaire.[67]  Indeed, documents in the record, as well as Stevens's testimony, show that the first time anyone at Liva and Nassetta or Arrow mentioned *anything* to Stevens about his mental health was after Arrow promised him his job back if he passed the stress test, and after he passed the test.[68]  Liva and Nassetta's office notes show that between June and September 2002, the only medical issues it discussed with Arrow, the Union, or Stevens were hepatitis and an "EST" (exercise stress test).[69]  Rucker's August 13, 2002 notes show that neither Arrow nor Liva and Nassetta told neither him during June through August 2002 they needed clarification about Stevens's mental health.[70]  As late as September 3, 2002 (right before Stevens passed his stress test), Liva and Nassetta told Andrews that Stevens needed an "additional test" (the

---

[61]  Defendant's September 13, 2004 Responses to Plaintiff's First Set of Interrogatories and Requests for Production, ("Coach's September 13, 2004 Responses"), Exhibit 14, Responses to Interrogatories 16 & 17.
[62]  Stevens Depo., Exhibit 2, at 72:15-20.
[63]  *Id.* at 72:22 – 73:8.
[64]  Liva Depo., Exhibit 4, at 78:21 – 79:5.
[65]  Coach's September 13, 2004 Responses, Exhibit 14, Response to Interrogatory 18.  Coach's October 15, 2004 Amended Responses to Plaintiff's First Set of Interrogatories, ("Coach's Amended Responses"), Exhibit 15, Amended Response to Interrogatory 19.
[66]  Stevens Depo., Exhibit 2, at 72:6.  Rucker Depo., Exhibit 3, at 37:1-2.
[67]  Stevens Depo., Exhibit 2, at 134:20-21; 143:9-14.  Liva and Nassetta office notes, Exhibit 11, at 1.
[68]  Stevens Depo., Exhibit 2, at 134:20-21; 143:9-14.
[69]  Liva and Nassetta office notes, Exhibit 11, at 1.  Liva Depo., Exhibit 4, at 30:23-24.
[70]  Garfield Rucker's Handwritten Notes, Exhibit 16.

stress test); it did not say it needed psychological clearance.[71]   The first communication in Liva and Nassetta's office notes to anyone about a psychological matter was an October 23, 2002 conversation with Lindsay.[72]   Nobody told Stevens about the psychological issue until October.

So instead of letting Stevens return to work unconditionally as it had promised, Arrow created another obstacle and let him drive for only 30 days in October and November, with a further condition for reinstatement.[73]   During that period he had to give Liva and Nassetta "documentation from [his] *doctor* with respect to [his] psychiatric condition" in order to be allowed to return unconditionally.[74]   Having been shut out from work for four months and in need of money, Stevens signed an Agreement saying he'd get this "documentation."[75]

As he said he would, Stevens set out to get the documentation from a doctor.   And it appeared, based on all paperwork Arrow gave Stevens, that this certification could *only* come from a medical doctor (or someone with a PhD):  The October 10, 2002 Agreement specified that the information had to come from a "*doctor.*"[76]   The Liva and Nassetta clearance form Coach gave Stevens said "*Dear Doctor.*"[77]   Liva and Nassetta's October 3, 2002 Additional Requirements for DOT Certification form also specified that the "evaluation" had to be done "by a *psychiatrist.*"[78]   Liva and Nassetta's "Appendix C – Initial Screening" 28 questions and considerations are for an "examining *physician* " to

---

[71]  September 3, 2002 e-mail from Shawana Brown to Phil Andrews, Exhibit 17.
[72]  Liva and Nassetta office notes, Exhibit 11, at 1.
[73]  Coach's October 10, 2002 temporary return to work agreement ("October 10, 2002 Agreement"), Exhibit 18.
[74]  *Id.* (emphasis added).
[75]  *Id.*
[76]  *Id.* (emphasis added).
[77]  Liva and Nassetta DOT Certification form, Exhibit 19.  (emphasis added).
[78]  Liva and Nassetta Additional Requirements for DOT Certification form ("Liva and Nassetta Additional Requirement form"), Exhibit 20.  (emphasis added).

use in determining driver fitness.[79]  None of these documents said that anyone *other than* someone with a MD or doctorate degree could have certified Stevens.[80]

Not knowing what degrees Lindsay held or whether he was a "psychiatrist," Stevens asked him to certify him to return to work under the 49 CFR §391.41 "mental disorder" criteria.[81]  Lindsay said he couldn't fully evaluate Stevens under these standards because he was not a psychiatrist.[82]  But, thinking he was helping Stevens get back to work, he sent a letter to Liva and Nassetta saying that Stevens's counseling "focus[ed] on marital issues."[83]  He did not say that he had treated Stevens for a "mental, nervous disease or psychiatric disorder," because he hadn't.[84]

Still thinking that he still needed to get Liva and Nassetta's clearance form signed by a "doctor," Stevens went back to see Lee, his primary care physician, and asked him if he could evaluate and certify him.[85]  Lee said he could not because he was only qualified to comment on physical medical issues, not psychiatric ones.[86]

In early 2003 Stevens hired counsel to help him get his job back.  On February 6, 2003, his counsel, Thomas G. Moukawsher, wrote to Arrow and explained the chronology of Stevens's attempted return to work and said that Stevens had not been told "the exact steps he must take in order to return to work."[87]  On March 5, 2003 Arrow

---

[79]  Appendix C – Initial Screening, <u>Exhibit 21</u>.  (emphasis added).
[80]  October 10, 2002 Agreement, <u>Exhibit 18</u>.  Liva and Nassetta DOT Certification form, <u>Exhibit 19</u>.  Liva and Nassetta Additional Requirements form, <u>Exhibit 20</u>.  Appendix C – Initial Screening, <u>Exhibit 21</u>.
[81]  Stevens Depo., <u>Exhibit 2</u>, at 97:4-5; 85:11 – 86:19.
[82]  *Id.* at 86:8-12.
[83]  *Id.* at 89:8-17.  October 23, 2002 letter from James R. Lindsay to Mary Ellen Bliss ("10/23/02 letter, J. Lindsay to M. Bliss"), <u>Exhibit 22</u>.
[84]  10/23/02 letter, J. Lindsay to M. Bliss, <u>Exhibit 22</u>.
[85]  Stevens Depo., <u>Exhibit 2</u>, at 144:10-20.
[86]  *Id.* at 144:10-20.
[87]  February 6, 2003 letter from Thomas G. Moukawsher to Peter A. Janus ("2/6/03 letter, T. Moukawsher to P. Janus"), <u>Exhibit 23</u>.

responded by saying, "Dr. Liva requires certification at this time from a *psychiatrist* [. . . .]"[88]

So Stevens then went to see Dr. Vipin Patel, a psychiatrist.[89]  He showed Patel the 28 questions and considerations developed by Liva and Nassetta to "aid the examining *physician* in teaching [sic] a diagnosis."[90]   Stevens also showed Patel the Liva and Nassetta document "§391.41(b)(9) Mental Disorders."[91]   The §391.41(b)(9) criteria include making a determination about whether Stevens was "highly susceptible to [. . .] schizophrenia, affective psychoses, paranoia, anxiety or depressive neuroses [. . . .]"[92]  The Mental Disorders document also listed a website for the physician to consult for "additional clarification for each area."[93]  Because there were so many mental conditions listed on the two forms, Patel told Stevens he could not verify, without lengthy psychoanalysis, that he had none of them.[94]  Patel suggested that Stevens ask Arrow for the name of a psychiatrist who might be able to.[95]

That's what Stevens did – he turned to Arrow for help.[96]  On May 28, 2003 he wrote to Arrow and asked Liva and Nassetta to "provide him with the name of a psychiatrist [who] would be able to conduct the required evaluation of Mr. Stevens

---

[88]   March 5, 2003 letter from Peter A. Janus to Thomas G. Moukawsher ("3/5/03 letter, P. Janus to T. Moukawsher"), Exhibit 24 .  (emphasis added).
[89]   Stevens Depo., Exhibit 2, at 97:12 – 98:1.
[90]   *Id.* at 145:2-6.  Appendix C – Initial Screening, Exhibit 21.  (emphasis added).
[91]   Stevens Depo., Exhibit 2, at 145:2-6.  §391.41(b)(9) Mental Disorders, Exhibit 25.
[92]   §391.41(b)(9) Mental Disorders, Exhibit 25.
[93]   *Id.*
[94]   Stevens Depo., Exhibit 2, at 100:11 – 101:7; 102:19.  (To be sure he was giving Patel the correct forms, the undersigned requested these documents from Attorney Janus.  Mr. Janus supplied them on March 17, 2003.  Notably, this cover sheet also indicated that Stevens's clearance had to come from a psychiatrist. *See* March 17, 2003 Fax Cover Sheet, Exhibit 26).
[95]   Stevens Depo., Exhibit 2, at 100:18-20.
[96]   May 28, 2003 letter from Ian O. Smith to Peter A. Janus ("5/28/03 letter, I. Smith to P. Janus"), Exhibit 27.

during the course of one appointment."[97]  Stevens was willing to do what was reasonably needed to return to work, but was not willing to "undergo lengthy treatment [. . .] to prove he ha[d] no need to do so."[98]  Even though Stevens was still an Arrow employee, Arrow callously ignored his plea for help, and never answered his letter or called counsel.[99]  Arrow revealed during discovery that "there was no response because Dr. Liva did not have any names of psychiatrists in Connecticut or Rhode Island."[100]  But really, the record reflects that Arrow never even asked Liva for such names.[101]  By November 12, 2003 it was clear that Coach was not going help him get his job back so Stevens sued Coach.[102]

While he was trying to get his job back (before he sued), Arrow told Stevens on at least *six occasions* that he could only get clearance on the mental health issue from a doctor.[103]  Then, when it was too late to have done Stevens any good, Coach changed its story about who had to clear him.  After Stevens filed suit, Coach told Stevens that a "psychiatrist *or other comparable professional*" could provide a "letter of clearance."[104]  Liva testified at his deposition a psychiatrist or a *psychologist* could have cleared Stevens.[105]  Stevens learned in discovery the *physician's assistant* who'd examined him for Coach in the past – and who worked two towns away from his home – could have

---

[97] *Id.* at 2.
[98] *Id.* at 2.
[99] Coach's September 13, 2004 Responses, Exhibit 14, Responses to Interrogatories 3, 5 & 6.
[100] *Id.*, Responses to Interrogatory 6.
[101] Liva Depo., Exhibit 4, at 56:9-23; 64:5-19.
[102] Stevens Depo., Exhibit 2, at 95:8-13.
[103] October 10, 2002 Agreement, Exhibit 18.  Liva and Nassetta Certification form, Exhibit 19.  Liva and Nassetta Additional Requirement form, Exhibit 20.  Appendix C – Initial Screening, Exhibit 21.  3/5/03 letter, P. Janus to T. Moukawsher, Exhibit 24.  March 17, 2003 Fax Cover Sheet, Exhibit 26.
[104] Coach's September 13, 2004 Responses, Exhibit 14, Responses to Interrogatory 4.
[105] Liva Depo., Exhibit 4, at 82:18.

cleared him.[106]   Indeed, a nurse or chiropractor could have cleared him.[107]   But when he was desperately trying to get his job back, Coach never told Stevens that any of these people could have cleared him.

Since hiring counsel, Stevens has tried to look for work, especially after it became clear that Coach was not going to respond to his pre-suit requests for help and wouldn't take him back.[108]   But with a junior high school education and no medical clearance to do the one skill he has – drive a bus – he has not been successful.[109]   Following his wife's death in January 2004, Stevens began seeking job retraining at the VA hospital and trying to get his GED.[110]

## III.   LAW AND ARGUMENT

### A.  Summary Judgment Generally

Under Federal Rule 56(c) and the 1986 Supreme Court decision *Anderson v. Liberty Lobby, Inc.*, a motion for summary judgment will only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[111]   According to another 1986 Supreme Court case, *Celotex Corp. v. Catrett*, the moving party carries the

---

[106]   On January 23, 2002, Raymond Kaiser, a certified physician's assistant at one of Liva and Nassetta's contracting clinics in Norwich, found that Stevens did not have any "Nervous or psychiatric disorders [or] depression."  (January 2002 Medical Report, <u>Exhibit 1</u>).  Kaiser then certified that Stevens "[met] the standards in 49 CFR 391.41 [and] qualifie[d] for a 1 year certificate."  (*Id.*).  Physician's assistants at the Norich clinic certified Stevens to drive under 49 CFR 391.41 on at least two other occasions.  (Medical Examiner's Certificate, exp. date December 27, 2000.  Medical Examiner's Certificate, exp. date December 27, 2001, <u>Exhibit 7</u>).
[107]   Coach USA Medical Examiner's Certificate, <u>Exhibit 6</u>.
[108]   Stevens Depo., <u>Exhihit 2</u>, at 16:17-21; 116:20 – 117:4.
[109]   *Id.* at 18:14-21.
[110]   *Id.* at 137:13; 18:12-21.
[111]   477 U.S. 242, 247 (1986).

burden of demonstrating an absence of a genuine issue of material fact.[112]  According to the Second Circuit in 1991 in *Bryant v. Marfucci*, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper."[113]  Furthermore, according to the District of Connecticut in 2001 in *Soras v. University of New Haven*, "facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the *non-moving* party."[114]  The Second Circuit had held in *Heyman v. Commerce and Industry Ins.* in 1975 that this is true even where the evidence is capable of supporting competing inferences.[115]

### B.  Arrow Cannot Show That It Had a Legitimate Non-retaliatory Reason For Repeatedly Keeping Stevens from Returning to Work

According to the 2004 Second Circuit decision *Potenza v. City of New York*, an employer's "prohibited acts" under FMLA §2615 fall into two categories: interfering with an employee's right to take FMLA leave and retaliating against an employee who took it.[116]  The Court held in *Potenza* that a version of the *McDonnell Douglas*[117] Title VII retaliatory discharge test applies in FMLA retaliation cases.[118]  Under the modified test, in order to make a *prima facie* case of retaliation, the FMLA plaintiff must show that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment actions occurred under circumstances giving rise to an inference of retaliatory intent.[119]

---

[112]  477 U.S. 317, 323 (1986).
[113]  923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).
[114]  154 F. Supp. 2d (D. Conn. 2001).
[115]  524 F.2d 1317, 1319-20 (2d Cir. 1975).
[116]  Potenza v. City of New York, 365 F.3d 165, 167 (2d Cir. 2004).
[117]  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).
[118]  Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).
[119]  Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).

With respect to the first criterion, Stevens exercised rights protected by the FMLA.  On about May 10, 2002 he told Arrow he needed to take leave because of his hepatitis related fatigue.  On June 6 Arrow handed him a Return to Duty Questionnaire it gives to returning "sick or injured" drivers.  The Questionnaire states that Stevens was out from May 10 through June 8, and lists "28" as the "Number of Days-Off."  That Stevens worked for six days during the first week of his one-month leave does not mean he didn't take FMLA leave.[120]  Nor does the fact that he requested four paid days off in the middle of the leave.[121]  In the 2001 Ninth Circuit Court of Appeals decision *Rowe v. Laidlaw*, a bus company employee requested a reduced work schedule because of an ankle injury.[122]  Like Stevens, Rowe did not discuss with her employer whether her "leave" would be "designated as leave under the FMLA."[123]  And like Stevens, she worked during leave.[124]  The Court held that the leave was "FMLA-qualifying" because under the Act "there is no principled reason for distinguishing between paid and unpaid leave [. . . .]"[125]  That Stevens, a bus driver making $11.25 per hour, worked over 71 hours during the first seven days of his 28 day leave should not be held against him and does not mean he was not legitimately out on FMLA leave for the remaining 21 days.  That he requested "personal leave" during this time is also irrelevant.  Under the Court's logic as expressed in *Rowe*, to conclude Stevens was not out on FMLA leave would "frustrate the purposes of the FMLA [. . . .]"[126]

---

[120] Defendants' December 31, 2004 Summary Judgment Memorandum at 2.
[121] *Id.*
[122] 244 F.3d 1115, 1116 (9th Cir. 2001).
[123] *Id.* at 1117.
[124] *Id.*
[125] *Id.* at 1118.
[126] *Id.*

With respect to the second element of the *Potenza* test, Stevens was qualified for his position; driving a bus is what he'd been doing for 15 years prior to his FMLA leave. But this case is not like the Title VII discrimination actions for which the *McDonnell Douglas* test was created.  In those cases employees in protected classes claim they were not given jobs for which they applied and were qualified.  Therefore, the *Potenza* test may be most useful in a case where someone, like Mr. Potenza, comes back from FMLA leave and is months later removed based on what the company claims is poor job performance and restructuring.[127]  However, in Stevens's case, Arrow has already argued that although he may have once been qualified for his job, he is no longer because he failed to satisfy DOT and company medical certification requirements.  So in situations in which the employer retaliates by ensuring that the employee does not *become* "re-qualified" after FMLA leave, element two of the test can be satisfied only through examination of the facts of the case.  This element should be decided after analyzing element four, below, the employer's alleged adverse actions.  With respect to the third element of the test, Stevens doubtless suffered an adverse employment action immediately upon his attempted return to Arrow:  not being allowed to work.

The final element of the *Potenza* test is the most important. Arrow's actions give rise to an inference of its retaliatory intent in not letting Stevens return to his job: 1. It didn't tell him plainly and precisely what the medical information it needed from him during the first two months he tried to return to work.  2. Arrow promised him that if he did one thing – passed a cardiac stress test – he could return to work.  When he passed the test it wouldn't let him come back.  3. It didn't, for about four months after he first tried to return to work, tell him that there was second thing – a psychological clearance from a

---

[127]  365 F.3d 165, 166 (2d Cir. 2004).

doctor or a psychiatrist – he needed to do to come back.  4. After a psychiatrist explained that clearing him would take an unreasonable amount of time, Arrow ignored his request for the name of someone who would be able to clear him in a reasonable amount of time. 5. Arrow never asked Liva if he knew the name of such a person.  6.  While he was trying to get a doctor or psychiatrist to clear him, Arrow never told him that the clearance didn't actually need to come from a doctor or psychiatrist (but could have come from a variety other non-doctors health care workers).  It told him this two years later.

According to the 2004 District of Connecticut case, *Bruno v. Sonalysts, Inc.*, once an employee has made his *prima facie* case, the burden shifts to the employer to provide a legitimate non-discriminatory reason for its actions.[128]  Because Stevens has made a *prima facie* showing of FMLA retaliation, Arrow must now show that it had legitimate non-retaliatory reasons for all of these acts or omissions.  As the Second Circuit held in 1995 in *Cronin v. Aetna Life Ins. Co.,*

> [u]nless the employer has come forward with evidence of a dispositive nondiscriminatory reason [. . .] which *no rational trier of fact could reject*, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial.[129]

Arrow has attempted to give a legitimate reason for its refusal to let Stevens return to work:  Stevens has not satisfied DOT and Coach Medical Management Program requirements.  But this simplistic explanation does not adequately address the half-dozen or so separate instances of Arrow's interference with Stevens's attempts to return to work.  Especially relevant to Stevens's showing retaliatory intent is that the obstacles

---

[128]  2004 U.S. Dist. LEXIS 23848 at *10-12 (D. Conn. 2004).
[129]  46 F.3d 196, 203 (2d Cir. 1995).

began immediately upon his return from leave.[130]  From these facts a jury could conclude that Arrow retaliated against Stevens for exercising his FMLA rights and taking leave and the "legitimate" reasons it cites in its Motion are pretexts.

District Courts in the Second Circuit commonly deny employers' motions for summary judgment under the *Potenza* burden shifting test in FMLA retaliation claims.  In the 2004 District of Connecticut case, *Walker v. Access Agency* the Court denied the employer's motion for summary judgment because it found that Walker had "established a question of fact that must be decided by a jury."[131]  In the 2002 Southern District of New York case, *Brenlla v. LaSorsa Buick* the Court denied LaSorsa's motion for summary judgment on the plaintiff's FMLA retaliation claim in part because the "temporal proximity between the request for reinstatement and the termination" was "credible evidence to support a jury's conclusion" that the reason for the termination was pretextual.[132]  And in the 2002 case *Merli v. Bill Communications* the same New York Court denied the employer's motion for summary judgment because FMLA retaliation claims, like employment discrimination claims in general, often turn on "elusive factual question[s]" regarding an "employer's intent."[133]  The cases Arrow relies on to support its position that it acted reasonably are factually distinguishable from what happened to Stevens.  In those cases, employers did not keep raising the bar for, misleading, and ignoring employees who attempted to return to work.  The cases cited by defendants, such as the Tenth Circuit's *Cooke v. Bean Transport*[134] and the Northern District of

---

[130]  *See Hodgens v. General Dynamics,* 144 F.3d 151, 168 (1st Cir. 1998)("close temporal proximity between two events may give rise to an inference of causal connection.").
[131]  2004 U.S. Dist. LEXIS 19624 at *27 (D. Conn. August 31, 2004).
[132]  2002 U.S. Dist. LEXIS 9358 at *25 (S.D.N.Y. May 28, 2002).
[133]  2002 U.S. Dist LEXIS 4530 at *20 (S.D.N.Y. March 18, 2002).
[134]  72 Fed. Appx. 740 (10th Cir. 2003).

Indiana's *Rice v. Genova Products*[135], which address the importance of compliance with DOT regulations do not lessen the severity of (or explain) the sequence of retaliatory acts committed by Arrow.

### C. Under The FMLA Stevens Was Not Required to Exhaust His Administrative Before Bringing Suit.

The FMLA does not require an employee to exhaust administrative remedies prior to bringing suit.[136]  And the regulations promulgated under the FMLA explicitly give an employee the choice of either filing an administrative complaint or filing a private lawsuit.[137]  Accordingly, the district courts within the Second Circuit, such as the court in *Baber v. Runyon* in 1998, have said that "FMLA does not contain an exhaustion requirement."[138]  Other circuits agree that the FMLA does not require exhaustion of administrative remedies.[139]

Arrow argues that Stevens was required to pursue administrative remedies available through the Department of Transportation.  To support its contention it relies primarily on cases brought under the ADA.  However, such reliance is inapposite because the ADA's statutory scheme explicitly requires the exhaustion of administrative remedies, while the FMLA's does not.[140]  This distinction was recognized by the Third Circuit in *Churchill*, where the Court said that "[u]nlike the FMLA, both the [ADA] and

---

[135] 978 F. Supp. 813 (N.D. Ind. 1997).

[136] *See* 42 U.S.C. § 2617(a)(2).

[137] 29 C.F.R.  § 825.400(a).

[138] 1998 U.S. Dist. LEXIS 20233, at *24 (S.D.N.Y. Dec. 28, 1998).

[139] *Churchill v. Star Enters.*, 183 F.3d 184, 191 (3d Cir. 1999); *Ogborn v. United Food & Comm. Workers, Local No. 881*, 2000 U.S. Dist. LEXIS 14092, at *30-31 (D. Ill. 2000) ("the FMLA does not itself require exhaustion of any administrative remedies, let alone exhaustion before the EEOC"); *Shannon v. City of Philadelphia*, 1999 U.S. Dist. LEXIS 2428, at *12 n.4 (E.D. Pa. Mar. 5, 1999) ("FMLA does not require a plaintiff to pursue any administrative remedies before filing suit in federal court"); *Krohn v. Forsting*, 11 F. Supp. 2d 1082, 1086 (E.D. Mo. 1998) ("exhaustion of plaintiff's administrative remedies is not required prior to initiating this FMLA action").

[140] *Compare* 42 U.S.C. § 12117(b) with 29 U.S.C. § 2617 and 29 C.F.R. § 825.400(a).

the [Pennsylvania Human Relations Act] require pursuit of administrative remedies before a plaintiff may file a complaint in court."[141]   In addition, in *Spurlock v. NYNEX*, the Western District of New York rejected an ADA claim for failure to exhaust administrative remedies, but spared the plaintiff's FMLA claim "[b]ecause the FMLA does not contain an administrative exhaustion requirement [. . . .]"[142]

The two FMLA cases Arrow cites to support its position are both readily distinguishable from Stevens's case.   First, it cites the 1996 North Carolina decision *Mann v. Haigh*, in which the plaintiff, a U.S. Marine Corps employee, sued under Title II of the FMLA.[143]   The court held that because Title II does not provide for a private cause of action, the Mann's only recourse was through the Department of Defense's review process.[144]   Here, *Mann* is distinguishable because Stevens, a private sector employee, sued under Title I of the FMLA, which provides for a private cause of action.[145]   Second, the Arrow cites the 1996 Ohio decision *Ladd v. Second Nat'l Bank of Warren*, in which a plaintiff brought an FMLA suit against the FDIC as receiver of her former employer, a failed bank.[146]   The court held that it lacked jurisdiction because the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") requires a claimant of a failed depository institution for whom the FDIC is the receiver to exhaust her administrative remedies.[147]   As FIRREA does not apply to the instant case, *Ladd* does not offer any support for the defendant's proposition.[148]

---

[141]  183 F.3d at 191.
[142]  949 F. Supp. 1022, 1030 (W.D.N.Y. 1996).
[143]  966 F. Supp. 403 (E.D.N.C. 1996).
[144]  *Id.* at 404.
[145]  *See Krohn*, 11 F. Supp. 2d, at 1085 (distinguishing *Mann* on identical grounds).
[146]  941 F. Supp. 87 (N.D. Ohio 1996).
[147]  *Ladd*, 941 F. Supp., at 90-91.
[148]  *See Krohn*, 11 F. Supp. 2d, at 1085 (distinguishing on the same grounds).

### D. The Union's CBA's Grievance and Arbitration Provisions Do Not Preclude Stevens from Pursuing His FMLA Claim in Federal Court.

Agreements to arbitrate statutory rights in CBAs are viewed through a different prism than agreements made individually by the employee.[149]  Generally, according to the First Circuit's 2002 decision *Plumley v. S. Container, Inc.* statutory rights, including an employee's rights under FMLA, "cannot be consigned to the grievance procedures created under [CBAs]."[150]  This limitation is applied to CBAs because "[i]f unions were so empowered, the rights of a minority (each individual union member) would be subject to the will of the majority."[151]

The Second Circuit in 2002, in *Rogers v. N.Y. Univ.*, addressed the effect of a CBA's grievance and arbitration provisions on an employee's right to bring a federal suit under FMLA.[152]  The court held that the CBA did not preclude the plaintiff from bringing an FMLA claim in federal court.  The court distinguished between two lines of Supreme Court precedent.  In *Alexander v. Gardner-Denver Co.*, the Court held in 1974 that an employee who had his discharge arbitrated under a CBA's grievance procedure was not precluded from bring a federal action on the same conduct.[153]  On the other end of the spectrum, the Court in *Gilmer v. Interstate/Johnson Lane Corp.* held in 1991 that an employee who individually agreed to waive his right to a federal forum could be forced to arbitrate a discrimination claim.[154]  The *Rogers* court determined that because the

---

[149]  *See, e.g., Rogers v. N.Y. Univ.*, 220 F.3d 73, 75 (2d Cir. 2000).
[150]  303 F.3d 364, 374 (1st Cir. 2002).
[151]  *Id.*
[152]  220 F.3d 73 (2d Cir. 2000).
[153]  415 U.S. 36 (1974).
[154]  500 U.S. 20 (1991).

arbitration provision in issue was a union negotiated CBA, it fell within *Alexander* and was unenforceable.[155]

Again, the cases cited by Arrow to support its contention that Stevens must arbitrate his FMLA claim are distinguishable. The two cases it cites, the 1996 Texas decision *Satarino v. A.G. Edwards & Sons*[156] and the 1997 South Carolina decision *Reese Comm. Credit Corp.*[157] both required an employee to arbitrate a claim that was unambiguously covered by an individually agreed to arbitration provision. However, reliance on these cases is inappropriate because the agreement at issue is the CBA negotiated by Stevens's union and not an agreement he negotiated individually. As discussed above, this distinction is crucial as it demarcates enforceability from unenforceability.

### E.  Defendant Peter Pan Bus Lines is Not Entitled to Judgment as a Matter of Law.

Stevens did not communicate with Peter Pan representatives concerning the steps he needed to take to return to his job at Arrow. However, this does not mean that Peter Pan should be dismissed as a defendant in his case. As defendants admit, "[i]n 2003, the assets of Coach in Connecticut, including the Arrow Line, Inc., were sold by Coach to Peter Pan."[158] The question remains whether Peter Pan acquired any of Coach's or Arrow's liabilities. Until this question is resolved, Peter Pan should remain a defendant, as it may be liable as a successor for Arrow's or Coach's actions.

---

[155] *Rogers*, 220 F.3d at 75; *accord Fayer v. Town of Middlebury*, 258 F.3d 117, 123 n.2 (stating that "[i]n this Circuit, we have . . . held that an arbitration clause in a union collective bargaining agreement is not enforceable against an individual employee's ADA and [FMLA] claims).
[156] 941 F. Supp. 609 (N.D. Tex. 1996).
[157] 955 F. Supp. 567 (D.S.C. 1997).
[158] Defendants' December 31, 2004 Local Rule 56(a)1 Statement at ¶5.

## IV.      CONCLUSION

Contrary to Arrow's assertion, the "undisputed facts" of Stevens's case do not "provide a clear chronology of the events that followed Steven's request for reinstatement on June 6, 2002."[159]  They do not demonstrate that "Coach and Liva acted reasonably" with respect to his attempts to return to work or in response to his requests for information that would allow him to do so.[160]  They demonstrate that Arrow thwarted Stevens's efforts to come back to work and ignored countless opportunities to point him in the right direction.  The facts set forth in this Memorandum could lead a reasonable jury to conclude that Arrow retaliated against Stevens for taking FMLA leave.

Stevens respectfully requests that the Court deny defendants' Motion for Summary Judgment.

```
                        The Plaintiff
                        Charles Stevens


                        By ___/s/ Ian O. Smith_____
                            Thomas G. Moukawsher (ct08940)
                            Ian O. Smith (ct24135)
                            Moukawsher & Walsh, LLC
                            21 Oak Street, Suite 206
                            Hartford, CT  06106
                            Tel: 860.278.7005
                            Fax: 860.548.1740
                            e-mail: ismith@mwlawgroup.com

                            His Attorneys
```

---

[159] Defendants' December 31, 2004 Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 16; 17-18.

[160] Defendants' December 31, 2004 Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 16.

## **CERTIFICATION:**

A copy of the foregoing has been mailed, postage prepaid, to the following

counsel and pro se parties of record:


Peter A. Janus, Esquire
Siegel, O'Connor, Zangari,
O'Donnell & Beck, P.C.
150 Trumbull Street
Hartford,  CT  06103


Date:   February 7, 2005

_____/s/ Ian O. Smith_____
Ian O. Smith