## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Charles Stevens, Jr.,          :
     Plaintiff,               :
                              :
v.                            :
                              :    Civil No. 3:03cv1948 (JBA)
Coach U.S.A., Peter Pan       :
Bus Lines, Inc., and          :
KILT of CT, Inc.,             :
     Defendants.              :

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 20]

Plaintiff Charles Stevens, Jr., a bus driver, has brought this action against his former employer, Coach USA, and affiliated entities, under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA").  He alleges that the company retaliated against him for taking a period of medical leave in May 2002.  Defendants now move for summary judgment, see [Doc. # 20], and for the reasons that follow, their motion will be denied.

## I.    FACTUAL BACKGROUND

Stevens has worked as a bus driver since 1987, and he was hired as a charter bus driver by Arrow Line, a Coach USA subsidiary, in 2000.  Stevens Dep., Pl. L.R. 56(a)2 Stmt. [Doc. # 29], Ex. 2, at 12, 14.  After working for Arrow for approximately two years, Stevens was earning $11.25 per hour.  Id. at 118.  He was a member of the Amalgamated Transit Union Local 1348, whose collective bargaining agreement set the terms and conditions of

1

his employment.  See Agreement, Def. L.R. 56(a)1 Stmt. [Doc. #
21], Ex. C.

In May 2002, Stevens requested approximately a one month
leave of absence to recover from fatigue related to chronic
Hepatitis C.[1]  Stevens Dep. at 19-20.  Stevens was under the care
of Woong B. Lee, M.D., an internist in Norwich, Connecticut.  On
June 6, 2002, Dr. Lee wrote a note certifying that Stevens was
able to return to work; the note did not specify why Stevens had
been absent or what treatment he had undergone.[2]  That same day,
Stevens brought Dr. Lee's note to Arrow Lines and presented it to
Philip Andrews, the company's director of safety.  Andrews
testified that he informed Stevens that the company headquarters
would require more detailed documentation about Stevens' medical
condition, see Andrews Dep., Def. L.R. 56(a) 1 Stmt., Ex. D, at
15-16, but Stevens testified that all Andrews said to him was,
"welcome back."  Stevens Dep. at 27.  Andrews asked Stevens to
fill out a "Return to Duty Questionnaire."  See Def. L.R. 56(a)1
Stmt., Ex. I.

_____

[1]The record does not contain a written request for leave or
any written response, and it is unclear whether any Arrow Lines
personnel knew the reason for Stevens' medical leave at the time
he requested it.

[2]The note is a form letter that reads: "To Whom It May
Concern: Charles Stevens has been under my medical care.  The
patient has been out of work since 5-10-02 and may return to work
on 6-8-02."  Def. L.R. 56(a)1 Stmt., Ex. L.

The Questionnaire instructed, "Questions/Answers should only pertain to employee's most recent illness/injury."  <u>Id.</u>, Ex. I. Plaintiff circled "yes" on the two following questions: "Do you have or are you being treated for any mental, nervous disease or psychiatric disorder?" and "Are you taking any medication? (Prescription or over-the-counter)."  <u>Id.</u>  Plaintiff circled "no" to the question, "Do you have or are you being treated for **any** condition that would preclude safe operation of a [commercial motor vehicle] or cause sudden incapacitation?"  <u>Id.</u>

Plaintiff testified that he answered "yes" to the first question regarding psychiatric conditions because he had undergone marital counseling with his wife in Spring 2002. Stevens Dep. at 32-34.  He further testified that Arrow was aware of this marriage counseling because Stevens had had to request time off to attend.  <u>Id.</u> at 35-36.  Stevens stated that when he was filling out the Return to Duty form, "where I had circled No. 8 [the question regarding psychiatric disorders] I told Phil [Andrews], I said, 'You know, the only reason I'm checking this is because ... you know I went to marriage counseling.'  And he nodded, he knew that.  That's the only reason that [answer] was there."  <u>Id.</u> at 30.  Thus Stevens believed that Coach knew that his marital counseling was the reason for his affirmative answer to the question.

Plaintiff testified that he circled "yes" regarding

3

medications because he was taking Procardia for a heart condition.  Stevens testified that Arrow had known about this medication from the time he underwent his pre-employment physical examination, id. at 50, and Arrow's personnel file shows that plaintiff's Procardia prescription was noted on his re-certification physical on January 23, 2002, connected with a self-reported diagnosis of high blood pressure.  Pl. L.R. 56(a)2 Stmt., Ex. 1.

A medical firm, Liva and Nassetta, LLC, functioned as Coach's medical director.  Dr. Jeffrey Liva or his partner made all final decisions regarding Coach employees' medical qualifications under Department of Transportation Regulations. See Pl. Responses to Def. Req. for Admission, Def. L.R. 56(a)1 Stmt., Ex. E, at 1.  Plaintiff's Return to Duty Questionnaire was forwarded to Dr. Liva's office, and Dr. Liva refused to certify Stevens as fit to return to work without further information. Id. at 2.  Dr. Liva testified that he was concerned about plaintiff's answers to both the question about psychiatric disorders and the question about medications:

> What we needed was information on – first of all, we
> needed his diagnosis, description of the illness or
> injury with respect to any mental, nervous disease or
> psychiatric disorder, and we needed to know what kind of
> medication the individual was taking to determine whether
> the medication would interfere with his abilities to
> drive a commercial motor vehicle.

Liva Dep. at 17-18.

Plaintiff, however, testified that nobody from Dr. Liva's office or from Arrow Lines ever mentioned a need for documentation concerning a purported mental disorder until October 2002. Rather, plaintiff testified that he was only asked for more specific documentation of his physical condition. Stevens Dep. at 47.

On June 7, 2002, Stevens provided another note from Dr. Lee, which read:

> Mr. Charles Stevens has been under my care for his Coronary Insufficiency which requires Procardia, and also, intermittent flare ups of Hepatitis.
>
> Mr. Stevens may return to work on June 8, 2002.
>
> If you have any questions, please do not hesitate to contact me.

Def. L.R. 56(a)2 Stmt., Ex. N.

Coach informed Stevens that this note also was insufficient, and on July 17, Dr. Lee provided a third work release letter, which stated, "Mr. Charles Stevens has been under my care for his Hepatitis for which he has been followed very closely. There are no medical contraindications for his work." Id. at Ex. O. Dr. Liva testified that Dr. Lee's third note settled any uncertainty regarding whether plaintiff's hepatitis would inhibit his ability to work. Liva Dep. at 26.

However, Dr. Liva stated that there was still a "conflict" between Dr. Lee's second note concerning Procardia and the plaintiff's medical history, because Dr. Lee stated that the

medication was prescribed to treat coronary insufficiency while Stevens had told his medical evaluator in January 2002 that he took the medication for hypertension.  <u>Id.</u> at 29.  Plaintiff testified that he telephoned Dr. Liva to ask what further information needed to be provided.  According to Stevens, Dr. Liva requested further documentation of his heart condition and his need for Procardia.  Stevens Dep. at 51-52.  In August 2003, Dr. Liva and Arrow Lines personnel informed Stevens that if he passed an exercise stress test he could be certified as fit for duty.  <u>See</u> Def. Interrogatory Responses, 9/13/04, Pl. L.R. 56(a)2 Stmt., Ex. 14, at 9.  This is corroborated by Garfield Rucker, plaintiff's union representative, who by this point had become involved to advocate for plaintiff's right to return to work, and who understood Arrow's position to be that the only step plaintiff needed to complete in order to return to work was to pass the exercise stress test.  <u>See</u> Rucker Dep. at 30.  Plaintiff took the stress test at a Rhode Island hospital on September 24, 2002, and the result showed no cardiac problems preventing his return to work.  Def. L.R. 56(a)1 Stmt., Ex. S; Liva Dep. at 35.

Thereafter, on October 10, 2002, Dr. Liva and Coach permitted plaintiff to return to work with a 30-day temporary medical certificate.  <u>See</u> Pl. L.R. 56(a)2 Stmt., Ex. 18. However, they required him to sign an agreement that:

> ...during [this] one (1) month period you are required to
> submit to Dr. Liva documentation from your doctor with

> respect to your psychiatric condition.  You may have your
> doctor contact Dr. Liva for additional instructions on
> what information is needed.  If you or your doctor fail
> to submit the required information to Dr. [L]iva within
> one (1) month, you will be removed from service until you
> or your doctor have provided the required information and
> medical determination has been made.

Id.  Stevens testified that this was the first he had heard about

a need for psychiatric documentation. Stevens Dep. at 143.

On October 23, 2002, Nurse Mary Ellen Bliss from Liva and

Nassetta sent a fax to James Lindsay, the social worker who had

seen plaintiff for marriage counseling, with a long checklist of

psychiatric information.  Def. L.R. 56(a)1 Stmt., Ex. K., Ex. T.

In response, Lindsay sent a note on his letterhead stating:

> This will certify that Charles Stevens was seen by me at
> this office for six psychotherapy sessions.  The focus
> was on marital issues.
>
> The dates of attendance were: April 18, April 25, May 2,
> May 9, May 23 and June 6, 2002.
>
> Yours truly,
> James R. Lindsay, MSW, LCSW

Id. at Ex. J.  According to plaintiff, Lindsay did not feel

comfortable filling out the form because Bliss's instructions

were that it needed to be completed and signed "by a

psychiatrist," and Lindsay is not a psychiatrist.  See id. at Ex.

T.  Dr. Liva's office considered Lindsay's note insufficient,

however, and the next entry in their records indicates that they

were "still waiting for Dr's note" on October 31, 2002.  Id. at

Ex. K.

7

After unsuccessfully seeking psychiatric clearance from Lindsay, plaintiff returned to his internist, Dr. Lee, and asked him if he could fill out the form for Liva and Nassetta.  Stevens Dep. at 144.  Dr. Lee said he could not because he was not a psychiatrist.  Id.

In March 2003, Coach's Connecticut counsel, Peter A. Janus, set out Coach's requirements in response to a request from plaintiff's attorney:

> ... Mr. Stevens will have to provide a medical release from a psychiatrist, verifying that Mr. Stevens is fit to return to duty.... Due to the fact that Mr. Stevens originally indicated on his 'Return to Duty Questionnaire' that he was being 'treated for any mental, nervous disease or psychiatric disorder,' and also because his counselor, Mr. Lindsey [sic] verified that Stevens had attended six (6) psychotherapy sessions, Dr. Liva requires certification at this time from a psychiatrist before Stevens will be cleared to resume his driving duties.

Pl. L.R. 56(a)2 Stmt., Ex. 24.  Plaintiff sought out a psychiatrist, Dr. Vipin Patel, on May 1, 2003, but Dr. Patel informed plaintiff that he could not fill out the required form without a long series of therapy sessions.  On May 28, Stevens's attorney requested through counsel that Dr. Liva provide the name of a psychiatrist who could perform the evaluation in one meeting.  Id. at Ex. 25.  The letter from plaintiff's counsel concluded, "Mr. Steven[s] has been cooperative to date, and I urge you to help him now.  In the absence of a reasonable solution, Mr. Stevens will have no choice but to rely upon the

legal remedies available." Id.  Defendants never responded.

Plaintiff filed the complaint in this case on November 12, 2003, see [Doc. # 1]; defendants Coach and KILT answered on January 19, 2004, see [Doc. # 8] and Peter Pan answered on February 10, 2004, see [Doc. # 11].

## II.  STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-1061 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Id. (citations omitted).  "If reasonable minds could differ as to the

import of the evidence ... and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain [] summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations, alterations and quotations omitted).

## III. DISCUSSION

### A.    Burden-Shifting Framework

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: ... Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). The Act guarantees reinstatement of employment upon the end of an employee's leave. See id. at § 2614(a). The statute further states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Id. at § 2615(a)(1). A claim that an employee was "punished" or retaliated against for exercising his or her rights under the FMLA is cognizable as interference with his or her FMLA rights. Potenza v. City of N.Y., 365 F.3d 165, 167 (2d Cir. 2004).

Because the intent of an employer is material in FMLA

10

interference claims, "the retaliation analysis pursuant to McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)] is applicable."  Potenza, 365 F.3d at 168; Walker v. The Access Agency, No. 3:02CV199 (AHN), 2004 WL 2216526 at *8 (D. Conn., Aug. 31, 2004).  To make out a prima facie case, a plaintiff "must establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  Potenza, 365 F.3d at 168.  Once the plaintiff has made out a prima facie case, the burden shifts to the defendant to state a legitimate non-discriminatory reason for its action.  If the defendant provides such a reason, the burden shifts back to the plaintiff to provide evidence from which a jury could conclude that the defendant's articulated reason for its action is pretextual and that the real reason for its action was retaliation for plaintiff's exercise of  rights protected under the FMLA.  See McDonnell Douglas, 411 U.S. at 802-03; Worster v. Carlson Wagonlit Travel, 353 F. Supp. 2d 257, 270 (D. Conn. 2005).

**B.  Analysis**

**1.  Prima Facie Case**

Defendants do not dispute that Stevens exercised his right to take FMLA leave or that Stevens experienced an adverse

11

employment action when Arrow Lines refused to schedule shifts for him upon his request to return from leave.

Defendants contend that Stevens was not qualified for the job under the second prong of the prima facie test because he lacked the necessary medical certification.  This argument assumes the conclusion, however, as the central issue in this case is whether defendants retaliated against plaintiff by preventing him from obtaining his medical recertification.  As discussed below, a genuine issue of material fact exists concerning defendants' intent throughout the recertification process.  "One cannot overlook the fact that at the heart of plaintiff's case is [his] charge that the evaluation scheme was itself biased and thus should not be used as a way to disprove [his] qualification for the job." Hurd v. JCB Int'l Credit Card Co., 923 F. Supp. 492, 501 (S.D.N.Y. 1996).  Thus defendants' proffer of Stevens' lack of medical certification does not present undisputed facts defeating Stevens' prima facie showing.

Defendants do not dispute that Stevens had driven a bus since 1987, was hired as a bus driver for Arrow Lines in 2000, and was recertified in 2001 and January 2002.  Therefore Stevens has put forth sufficient evidence to show that he was qualified for the position of bus driver.  See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 250, 254 (1981) (several years' experience sufficient to meet qualification prong); Slattery v.

Swiss Reins. Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001)
("[P]laintiff must show only that he possesses the basic skills
necessary for performance of the job.") (internal citation,
quotation marks and alteration omitted).

The fourth element of plaintiff's prima facie case, an
inference of discrimination, is established by proximity between
plaintiff's exercise of his FMLA leave and the adverse employment
action, which immediately followed.  See Clark County Sch. Dist.
v. Breeden, 532 U.S. 268, 273-74 (2001) (to establish retaliation
claim under Title VII, "temporal proximity must be 'very
close.'") (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248,
1253 (10th Cir. 2001)); Davis v. State Univ. of N.Y., 802 F.2d
638, 642 (2d Cir. 1986) (protected activity must be "closely
followed by adverse actions," and one-month period was
sufficient).

### 2.   Legitimate Non-Discriminatory Reason

Defendants proffer as their legitimate non-discriminatory
reason for refusing to schedule Stevens to work following his
request to return to duty that "Coach was merely complying with
DOT regulations concerning fitness for duty certification of a
driver and relying upon the determinations of Dr. Liva, its
medical director.  Without Liva's approval or certifications
Coach could not reinstate Stevens as a charter bus driver."  Mem.
in Supp. of Def. Mot. for Summary Judgment [Doc. # 22] at 11.

### 3.   Pretext

Stevens argues that defendants' proffered reason is pretextual and that rather than seeking answers to legitimate medical questions, defendants raised a series of obstacles to his return to work starting immediately after he tried to return from leave, by never telling him exactly what documentation was necessary for him to be recertified, and never being satisfied with what he submitted, in retaliation for exercising his FMLA rights.

First, Stevens offers evidence that his Procardia medication was documented in his medical file at Coach at least since January 2002, before he took medical leave.  Thus, reasonable minds could infer that defendants' demand for further documentation about his cardiac condition, and requirement of an exercise stress test, was unnecessary and a pretext to keep Stevens out of work.

Second, Stevens offers evidence that he was not informed until October 2003, more than four months after he requested reinstatement, that Coach and Dr. Liva required documentation regarding his "psychiatric condition."  Although Dr. Liva testified that as soon as he saw Stevens' Return to Work Questionnaire he wanted information concerning plaintiff's "yes" answers to questions about psychiatric disorders and medication, the first reference in Dr. Liva's office notes of a need for

14

psychiatric documentation is in October 2003.  As of August 2003, both Stevens and Rucker, his union representative, believed that the only remaining step was for plaintiff to pass an exercise stress test to rule out any disqualifying cardiac condition. After plaintiff passed the stress test, however, rather than putting him back to work, Coach demanded information from a psychiatrist regarding his mental condition, and then rejected the marriage counselor's report.  When Stevens could not readily obtain a psychiatrist to complete Coach's form without undergoing lengthy therapy, defendant refused to provide plaintiff with an alternative psychiatric referral.

Moreover, by Stevens' testimony, Coach knew that Stevens had attended marriage counseling and that that was the explanation for his "yes" answer to Question 8, raising the inference that Coach could have satisfied Dr. Liva's purported concerns about "psychiatric problems" early on and reduced Stevens' reinstatement ordeal.

A jury could reasonably infer from the chronology of events that defendants were making excuses to prevent Stevens from returning to work and their real motive was to retaliate for plaintiff's FMLA-covered absence.  Rucker testified that Coach "[j]ust didn't want him back, period. ... I mean, we examined everything out there that's possible to rectify the [situation]: We've been going to see your doctors, we've been going to see

15

your stress test, we've given you everything that you wanted. And yet there is no end to this." Rucker Dep. at 42.  It is unclear whether Stevens specifically mentioned an FMLA lawsuit in June 2002, but drawing inferences in plaintiff's favor at this stage, a reasonable jury could find that after plaintiff took FMLA leave and, after Coach refused to accept his first two doctor's notes, plaintiff threatened legal action and defendants retaliated against Stevens by inventing a series of documentation requirements that effectively prevented Stevens from ever returning to work for Coach.

Defendants argue that Liva, a contract employee who was not Stevens' supervisor, had no motive or incentive to retaliate against Stevens for taking FMLA leave.  However, this argument does not explain the chronology of events in this case, especially the lack of clarity concerning the information Dr. Liva required and the preexistence of information concerning Stevens' Procardia prescription in Stevens' medical file.

Defendants also argue that they are permitted under the FMLA and Department of Transportation regulations to request medical documentation before allowing plaintiff to drive a bus.  In Cooke v. C. Bean Transport, Inc., 72 Fed. Appx. 740 (10th Cir. 2003) (unpublished), cited by defendants, the plaintiff asserted that the defendant transport company's requirement that he "submit to an additional medical exam prior to returning to work" was itself

16

a violation of the FMLA.  Id. at 743.  The Tenth Circuit held that "employers may, in compliance with regulations issued by the DOT, impose more stringent requirements on certification of fitness."  Id. at 744.  Plaintiff Stevens, however, does not challenge the requirement that he submit to a medical examination.  Rather, his evidence supports his allegation that Coach never actually explained to him its exact medical requirements for returning to duty, and it continued to add new requirements as he satisfied Coach's previous demands.

Therefore the record shows a material dispute of fact requiring jury determination of whether Coach acted with retaliatory intent or merely in compliance with DOT regulations. Defendants' summary judgment motion on the grounds that they acted in good faith must be denied.

### C.   Exhaustion of Administrative Remedies

Defendants further argue that they are entitled to summary judgment because plaintiff has failed to exhaust his administrative remedies under the collective bargaining agreement and DOT regulations.[3]

### 1.   Collective Bargaining Agreement

---

[3]Contrary to plaintiff's argument, defendants do not appear to assert that the FMLA required plaintiff to bring an administrative claim before the Equal Employment Opportunities Commission before filing suit in federal court.  Thus, the case law cited by plaintiff holding that the FMLA does not "require pursuit of administrative remedies," is inapplicable.  See, e.g., Churchill v. Star Enters., 183 F.3d 184, 190 (3d Cir. 1999).

17

The United States Supreme Court has ruled that a collective bargaining agreement without "a clear and unmistakable waiver of the covered employees' right to a judicial forum for federal claims of employment discrimination" does not waive the employees' right to have discrimination claims adjudicated in federal court.  Wright v. Universal Maritime Serv. Corp., 525 U.S. 70, 82 (1998).  Interpreting Wright, the Second Circuit held:

> First, a waiver is sufficiently explicit if the arbitration clause contains a provision whereby employees specifically agree to submit all federal causes of action arising out of their employment to arbitration.... Second, a waiver may be sufficiently clear and unmistakable when the CBA contains an explicit incorporation of the statutory anti-discrimination requirements in addition to a broad and general arbitration clause.... Moreover, as the Supreme Court stated in Wright, the CBA should make compliance with the named or cited statute a contractual commitment that is subject to the arbitration clause.

Rogers v. N.Y. Univ., 220 F.3d 73, 76 (2d Cir. 2000) (citations omitted).

In Wright, 525 U.S. at 80, the CBA's "arbitration clause [was] very general, providing for arbitration of '[m]atters under dispute,' which could be understood to mean matters in dispute under the contract.  And the remainder of the contract contain[ed] no explicit incorporation of statutory antidiscrimination requirements."  Thus the Supreme Court held that the arbitration clause did not clearly and unmistakably provide for arbitration of plaintiff's claim under the Americans

with Disabilities Act.  Id. at 82.  In Rogers, the applicable
contract did contain a provision requiring the employer to comply
with the FMLA, but that commitment was not explicitly
incorporated into the general arbitration clause and therefore
arbitration of plaintiff's FMLA claim was not required because
"the collective bargaining agreement does not specifically make
compliance with the FMLA a contractual commitment that is subject
to the arbitration clause."  220 F.3d at 76 (emphasis in
original).

The collective bargaining agreement covering Stevens, like
the contract at issue in Wright, contains no mention or
incorporation of federal antidiscrimination laws.[4]  See
Agreement, Def. L.R. 56(a)1 Stmt., Ex. C, at 3.  Compliance with
the FMLA is not a term of the contract.  The section of the
agreement covering grievances provides: "Grievances involving a
dispute or claim arising out of or relating to the interpretation
or application of this agreement" shall be subject to
arbitration.  Id. at 4.  Thus, by its terms, the contract
provides for arbitration only of grievances arising out of the

------

[4]The contract provides: "The Employer and the Union agree
not to discriminate against any individual with respect to
hiring, compensation, and other terms and conditions of
employment because of such individual's race, color, religion,
sex and national origin, nor will they limit, segregate or
classify employees in any way to deprive any individual eployment
opportunities because of race, color, religion, sex or national
origin."  Agreement, Def. L.R. 56(a)1 Stmt., Ex. C, at 3.

contract's terms, not claims arising from federal statutes generally or from the FMLA in particular.

Absent a "a clear and unmistakable waiver," Wright, 525 U.S. at 82, of Stevens' right to adjudicate his FMLA complaint in a federal forum, Stevens is not required to arbitrate his claim under the collective bargaining agreement before pursuing his federal cause of action.  Therefore defendants' motion for summary judgment on the grounds of failure to follow the CBA's grievance procedures is denied.

### 2.   DOT Administrative Process

Defendants also seek summary judgment on the basis that plaintiff failed to exhaust his administrative remedies through the Department of Transportation regulations, which prescribe an administrative appeal procedure in cases of "disagreement between the physician for the driver and the physician for the motor carrier concerning the driver's qualifications."  49 C.F.R. § 391.47(b)(2).  Even assuming that this procedure must be exhausted in an FMLA case, which is not at all clear, see 29 U.S.C.A. § 2617 (no exhaustion requirements specified in individual enforcement provision of FMLA),[5] the regulation is inapplicable to Stevens because the crux of Stevens' complaint is not a disagreement between Dr. Lee and Dr. Liva.  Rather, Stevens

---

[5]Cf. Harris v. P.A.M. Transport, Inc., 339 F.3d 635, 638 (8th Cir. 2003) (ADA required exhaustion of DOT administrative appeal).

argues that instead of actually obtaining a medical opinion from Dr. Liva, Coach sent him through a series of hurdles that prevented his medical fitness from ever being determined.  This issue cannot be characterized as "a disagreement between the physician for the driver and the physician for the motor carrier."  49 CFR § 391.47(b)(2).  Therefore defendants' motion for summary judgment on this basis will be denied.

### C.   **Peter Pan**

Defendants argue Peter Pan should be dismissed as a defendant in this action because plaintiff testified in his deposition that he had no contact with Peter Pan's management concerning his FMLA leave.  Def. Mem. of Law at 20-21 (citing Stevens Dep. at 136).  Defendants also state that "Peter Pan acquired the Connecticut assets of Coach, which included The Arrow Line, the former employer of Stevens," in 2003.  Id. at 20.

Courts have held that successorship liability of a purchasing corporation for its predecessor's employment discrimination is a fact-specific inquiry.  See EEOC v. Sage Realty Corp., 507 F. Supp. 599 (S.D.N.Y. 1981) (Title VII case).  A "purchasing corporation is liable if there is an express or implied agreement that the purchaser will assume liabilities."  Long v. AT & T Info. Sys., Inc., 733 F. Supp. 188, 208 (S.D.N.Y. 1990) (citing Wheeler v. Snyder Buick, 794 F.2d 1228, 1236 n. 8 (7th Cir. 1986)).  Additionally, "[t]he purchasing corporation

21

may also be liable under the doctrine of successorship liability." Id. (citing Am. Bell, Inc. v. Fed'n. of Tel. Workers of Pa., 736 F. 2d 879, 888 (3d Cir. 1984); EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1092 (6th Cir. 1974)). Drawing from principles of labor law, the Sixth Circuit has established a frequently-cited test to determine whether a successor company is liable for its predecessor's discriminatory actions toward an employee:

> 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product.

McMillan, 503 F.2d at 1094.

The record is devoid of evidence on any of these factors related to Peter Pan's acquisition of Coach USA and whether Peter Pan is or is not Coach USA's successor in interest.  Peter Pan has not shown it is entitled to judgment as a matter of law.

22

**IV.   CONCLUSION**

Accordingly, defendants' motion for summary judgment [Doc. #
20] is DENIED.  The parties' joint trial memorandum will be filed
by October 7, 2005.

IT IS SO ORDERED.

/s/

_____

JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, September 8, 2005.**